DUNCAN v. CITY OF CHARLESTON.

PEIPER v. SAME.

1. CITIES AND TOWNS—BONDED INDEBTEDNESS—CONSTITUTION.—A CONTRACT under seal executed by the officers of a city council, binding it to pay a certain sum each year out of its current receipts for a number of years, is a bonded indebtedness, and violates in this instance sec. 7, of art. VIII., and sec. 5, of art. X., of Constitution

of 1895, since the bonded indebtedness of the city of Charleston is already more than eight per cent. of its taxable property.

2. Ibid.—Constitution.—The Act, 23 Stat., 51, enabling cities and towns to purchase or contract for water works, &c., if construed to permit a city to issue certificates of indebtedness to be paid out of current taxes in future years, is in violation of sec. 7, of art. VIII., of Constitution of 1895.

3. Contract—Trustee.—A city council, some of whose members are stockholders of another corporation, cannot execute a contract with such corporation for its benefit.

Petition by John Duncan and Catherine Mansfield, and one by John Fred. Peiper in the original jurisdiction of this Court, asking that the City Council of Charleston and the Charleston Light and Water Co. be perpetually enjoined from executing a proposed contract.

*Mr. A. M. Lee,* for Duncan and Mansfield, petitioners, cites: *This contract creates a bonded indebtedness:* 37 S. C., 554; 53 S. C., 274; *and offends* sec. 7, art. VIII., and sec. 5, art. X., of Constitution. *Act of 1899 (23 Stat., 51) is a special act:* 56 N. E. R., 155; 23 Ency., 1st ed., 149. *Does not repeal the act of 1881:* 23 Ency., 473, 484; 37 S. C., 558; 8 S. C., 129; 2 Woods, 346; 98 N. Y., 186; 8 Col., 528.

*Messrs. R. W. Shand* and *Jno. P. Thomas, jr.,* for Peiper, petitioner.    Oral arguments.

*Mr. Geo. S. Legare,* for city council of Charleston, respondent, cites: *The act of 1899 repeals the act of 1881:* 23 Stat., 51.    *The act of 1899 does not violate sub. XI., sec. 34, art. III.:* 59 S. C., 110; 170 Ill., 459; 131 Mo., 2; 62 Ind., 159; 40 N. J. L., 123; 23 Ency., 1st ed., 148; 47 N. J. L., 368; 48 N. E. R., 1003; 28 S. E. R., 891; 41 S. W. R., 1094; 77 Pa. St., 258.    *Act of 1899 is not a special law:* 23 Ency., 144, 148, 537; 49 V., 282; 93 N. C., 600; 29 Md., 516; 9 Me., 54; 6 Ind., 281; 37 Col., 366; 83 Ill., 585; 70 Ill., 398; 41 Minn., 74; 40 La. Ann., 463; 49 Ark., 325, 291; 53 N. J. L., 277; 128 Ind., 65; 131 Ind., 446; 124 Ill., 666;

42 N. J. L., 357; 42 N. J. L., 407; 62 Ind., 159; 31 Minn., 322; 47 Ohio St., 90; 21 Am. St., 772; 44 Ohio St., 247; 84 Ill., 590; 31 Ohio St., 592; 3 Ency., 1st ed., 698. *Act of 1899 is not violative of sec. 17, art III.,* 30 S. C., 1. *And repeals inconsistent parts of act of 1881:* 56 S. C., 400. *Contract for water supply is within police power and not restricted by act of 1881:* 33 S. C., 1; 30 S. W. R., 190; 59 Fed. R., 735.

*Mr. W. C. Miller,* for Charleston Light and Water Co., respondent, cites: *Is this contract a debt created beyond the municipal year?* 17 N. Y., 100; 36 Ia., 404; 98 Ill., 430; 7 Am. & Eng. Cor. Ca., 626; 128 Ind., 487; 30 S. W. R., 190; 39 S. W. R., 768; 17 N. Y., 213; 44 Pac., 358; 11 S. E., 558; 60 F. R., 961; 10 N. E., 782; 30 At. R., 959. *Is the act of 1899 unconstitutional?* 15 Ency. (1 ed.), 981; 30 N. J. L., 585; 100 Mo., 439; 44 Ohio, 98; 39 Id., 653; 43 Id., 98; 77 Pa., 338; 26 S. R., 430; 48 N. E. R., 1003. *If act of 1899 did not repeal act of 1881, there is one city of its class excluded from its provisions:* 59 S. C., 110; Con., art. VII., sec. 1.

June 20, 1901. The opinion of the Court was delivered by

MR. JUSTICE POPE. These actions, in the original jurisdiction of this Court, have for their common object the perpetual injunction by this Court of the city council of Charleston from entering into the contract with the Charleston Light and Water Company in regard to the latter furnishing to the former a water supply from the stream known as Goose Creek, at a distance of about sixteen miles from the city of Charleston, and at a point situate in Berkeley County. By the order passed by this Court on the 3d day of June, 1901, the two actions were blended and ordered to be heard together.

The plaintiffs in each action are citizens and taxpayers of the city of Charleston, and have a status in this Court

under the present Constitution of the State and the laws passed by the General Assembly of this State to enforce such constitutional right, always provided they can show themselves entitled to the extraordinary writ of a perpetual injunction to restrain the invasion of their rights by the defendants, respondents. The defendants are corporations under the laws of this State, and may sue and be sued in all of our Courts under their respective corporate names.

It is alleged in the pleadings that the city council of Charleston is about to execute a contract under its corporate seal to and with the Charleston Light and Water Company, whereby it binds the city of Charleston for the period of fifty years to allow the said Light and Water Company to lay its pipes and mains in and under its streets, alleys and ways, so that it may furnish water for public and private use and purposes, for the said period of fifty years next ensuing, upon the execution of said contract by the said two parties, defendant, and that as a compensation therefor the city council of Charleston will pay to said Charleston Light and Water Company $42,000 for each and every year embraced in the said period of fifty years, and will further allow said Charleston Light and Water Company to collect from its citizens the sums of money laid down in a schedule of prices for the use of water by its citizens; and all these concessions are bottomed upon the expenditure by the said Charleston Light and Water Company of large sums of money from its own treasury, to wit: $100,000, and of about $1,500,000 to be realized from the sale of its coupon bonds—at 95 cents of the par value of said bonds—said bonds to mature in fifty years, to bear interest at five per cent. per annum, and to be secured in their payment by a mortgage of all the property, immediate or prospective, of said Charleston Light and Water Company. An option is provided in said contract for the purchase by the city of Charleston of all the property of said Charleston Light and Water Company, whenever said city shall be clothed by law with the power to make such purchase on terms which are embodied in said contract. It

is alleged that for a favorable consideration the American
Pipe Manufacturing Company have been induced to lend a
helping hand to this enterprise, and carefully prepared speci-
fications for the system of water works as contemplated in
the contract by the Charleston Light and Water Company
with the city of Charleston is attached to the said contract.

It is also sought by the petitioners or plaintiffs to enjoin
the issue of any bonds by the said Charleston Light and
Water Company in furtherance of the alleged contract be-
tween it and the city council of Charleston. We need not
pause to enlarge upon the right of these petitioners to invoke
the aid of this Court in its original jurisdiction to prevent the
alleged invasion of their rights as taxpayers of the city of
Charleston by the alleged contract between the respondents.
To better understand this contention, we deem it proper to
insert the alleged contract. It is as follows:

"This agreement made and entered into this       day of
, A. D. 1901, by and between the Charleston Light
and Water Company, a corporation duly authorized by and
under the laws of the State of South Carolina, party of the
first part, and the city council of Charleston, of the said
State, party of the second part, witnesseth:

"I. First. In consideration of the promises and covenants
of the party of the second part, hereinafter set forth, the
party of the first part hereby covenants and agrees:

"1. That it will build and equip, or cause to be built and
equipped in a thorough and workmanlike manner, and in
accordance with the plans and specifications prepared by the
American Pipe Manufacturing Company, of Philadelphia,
Penn., and identified by the signature of the parties hereto,
a copy of which specification is hereto annexed, a system of
water works complete, of the capacity heinafter guaranteed;
the said system contemplating the purchase of the plant of the
present water works company, and the use of the same so far
as it may be available, the taking of water from a point on
Goose Creek, in the county of Berkeley, in the State afore-
said, the filtration of said water, and the conveyance to and

the distribution throughout the city of Charleston by means of suitable pipes and mains of the said water when so filtered; it being understood and agreed, however, that the party of the first part shall have the right to substitute a 24″ main for the 30″ provided for in said specifications, and that with the consent of the board of water commissioners, hereinafter appointed, said plans and specifications may be otherwise modified or altered by the party of the first part: *Provided,* The said modifications and alterations shall not be such as to impair the efficiency or capacity of the plant contemplated in said plans and specifications.

"2. The work of constructing said plant shall begin within thirty days from the date of these presents, and said plant shall be fully and finally completed, and ready for use and operation within twelve months of the date hereof: *Provided, however,* That if the party of the first part shall be prevented from beginning or prosecuting and completing the said work within the time herein agreed upon, by reason of the act of God, the public enemy, by strikes, by injunction or other legal proceedings, by municipal, state or national interference, or by failure of the party of the second part to comply with its part of the contract, the time during which the said party may be so delayed or prevented from beginning, prosecuting or completing said work, shall be added to the said period of thirty days or twelve months, as the case may be, hereinbefore fixed for the beginning and the completion of the said plant.

"3. The said system of water works to be built, as aforesaid, in accordance with said plans and specifications, and of such detailed plans and specifications as shall, from time to time, be furnished by the party of the first part, shall be constructed, equipped and completed according to the plans and specifications, and the board of water commissioners of the city of Charleston, hereinafter appointed, shall at all times have the right of inspecting, for the purpose of determining whether said plant has been so constructed, and of ascertaining the progress of the said work, and the quantity and

quality of the work completed, from time to time: *Provided,*
That the said board of water commissioners shall not in any
way impede the construction of the aforesaid works; and it
is agreed, that in case of any dispute arising relative to the
said works, the same shall be settled by arbitration, the party
of the first part appointing one arbitrator, the party of the
second part one arbitrator, and the two arbitrators thus appointed appointing a third; the decision of the majority of
said arbitrators to be final and binding.

"4. In the construction of the said plant the party of the
first part shall exercise the greatest care and diligence in the
use of the streets, alleys and public places of the city of
Charleston, and shall cause no unnecessary stoppage or interruption of the public travel over or upon the same, nor any
unnecessary injury to or interference with any pipes or
sewers which may now be lawfully located beneath the surface thereof; and will promptly repair any injury which may
be occasioned thereto. It will cause all excavations and obstructions to be properly lighted and guarded at night, and
when necessary, it shall station watchmen to guard the same;
and after the completion of the work, it shall restore all
roads, highways, streets, alleys, and other public places as
nearly as practicable to their former condition, without
unnecessary delay. It shall further take every precaution
to provide against danger to life and limb, or property happening in the construction of the said plant. And the said
party of the first part hereby agrees to hold the party of the
second part harmless from any liability which may result to
it by means of any violation of this section.

"5. The party of the first part, for itself and its successors,
covenants, promises, agrees and guarantees, to and with the
party of the second part, its successors and assigns, that the
supply of water at the point of intake on Goose Creek shall
not be less than a continuous available supply of 5,000,000
gallons of water per twenty-four hours at all seasons; and
that if at any time during the next two years after the completion of the works, the said supply of water shall fall

below the amount so guaranteed, the party of the first part will establish such auxiliary system as shall bring the supply of water up to the said guarantee of a continuous available supply of 5,000,000 of gallons per twenty-four hours. And it further covenants, promises and agrees and guarantees, that the system of works to be constructed by the party of the first part shall be capable of delivering, and shall deliver within the limits of the city of Charleston not less than 5,000,000 gallons of water per twenty-four hours, at all seasons; and that the water after filtration shall be when delivered, good potable water, and suitable for domestic, laundry and manufacturing purposes.

"6. Upon the completion of the said plant, the party of the first part shall notify the said board of water commissioners, and shall submit the said work for the inspection and approval of the said board; and with a view of determining whether the said work has been completed in accordance with the provisions of this contract, the said work shall be submitted to the tests hereinbefore agreed upon, and it is covenanted and agreed between the parties that in case of any dispute with reference to the said work, or any part thereof, that such dispute shall be submitted to and decided by arbitration in the manner hereinbefore provided. It is agreed that the tests before mentioned shall be as follows, viz: Each of the main pumping engines shall have a capacity of 5,000,000 gallons per twenty-four hours, under a test working pressure of 100 pounds per square inch. The duty of each pumping engine shall be not less than 75,000,000 foot pounds per 1,000 pounds of dry steam; the boiler pressure to be not less than 125 pounds per square inch while the said duty test is being made. The slip of the pumps is guaranteed to be not greater than three per cent. For the purpose of duty test, the party of the first part shall have the right to waste the water near the pumping station, and the said duty test shall be made independently of said other tests. The pumps shall work smoothly and be free from pound, undue noise or heating of the bearings. The pumping main

to the city shall be subjected to hydrostatic test of 100 pounds per square inch, and should any defects develop, they shall be immediately repaired. To test the capacity of the works, the party of the first part agrees to operate the same for two months and furnish to the water distribution station 5,000,000 gallons per twenty-four hours, while the pressure at King and John streets in said city is maintained at sixty pounds per square inch. The party of the second part shall furnish means for disposing of said water, and the measurement of the quantity shall be made by the displacement of the pumps. If, however, the party of the second part wishes to measure the quantity of water at the city, it shall be empowered to use a meter, weir or other accurate means of measuring said water: *Provided,* Any water delivered to consumers or industries, or for any other purpose outside of the city limits, shall be added to the quantity measured within said city to bring the total up to 5,000,000 gallons per twenty-four hours. If necessary, a test shall be made to determine the amount of leakage in the mains laid between the said pumping station and the city limits, and any leakage or defects found in said mains or any other pipes laid by the party of the first part, or any of the mains in the old system, shall be repaired by the party of the first part. The water after filtration shall show a removal of at least eighty-five per cent. of the matter held in suspension; eighty-five per cent. of the color by the platinum cobalt standard, and eighty-five per cent. of the albuminoid ammonia held in suspension. The number of bacteria per cubic centimeter in the filtered water after forty-eight hours incubation shall not exceed 200. The hardness of the water by the soap test shall not be greater than forty parts per 1,000,000, and the filtered water shall be free from objectionable odor and taste. Chlorin not to exceed ten parts per 1,000,000.

"Second. The party of the first part further covenants and agrees: 1. That the party of the first part shall cause to be kept accurate accounts of all work done, machinery and material furnished and labor employed, during each and

every month in connection with the execution of this contract, which accounts shall at all times be subject to the examination of the party of the second part; and the party of the first part further agrees to submit monthly to the board of water commissioners aforesaid, on or before the tenth day of each month, an approximate estimate of· the work done, machinery and materials furnished and delivered on the ground, and labor employed during the preceding calendar month; and the said board of water commissioners shall pass upon the said approximate estimates, and when approved by them, they shall authorize the party of the first part to order the mortgage trustee, hereinafter nominated, to issue the bonds of the party of the first part in payment for said work. And before the final payment for the said work is made, the party of the first part will submit to the said board of water commissioners accurate accounts of all work done, machinery and materials furnished, and labor employed upon the said work, and said final payment will be made after said board of water commissioners shall have had the opportunity of examining said accounts and approving the same: *Provided,* That such examination shall be made within thirty days after said accounts shall have been submitted as aforesaid, and within thirty days after said plant shall have been completed and accepted.

"2. That for the costs and expenses of constructing said works, including therein interest on money borrowed, and on bonds issued up to the final completion of said works, the cost of printing and engraving, of revenue stamps, trustee's fees, fees of engineers and inspectors, legal expenses, and all other costs, charges and expenses which have been borne by the party of the first part to the date of this contract as preliminary to the execution thereof, and which may be hereafter borne by the party of the first part in performance of said contract, and in the construction and completion of the said works to be built thereunder, the said party of the first part shall employ its capital of $100,000, and shall issue bonds of the character hereinafter described : *Provided, how-*

*ever,* That said bonds shall not be sold for less than ninety-five per cent. of their face value, and that the entire amount of the bonds issued shall not, at ninety-five per cent. of their face value, exceed the actual *bona fide* cost of the construction and expense as above defined, after the application to such construction of the said capital of $100,000 : *And provided, further,* That the entire issue of bonds at their face value shall not exceed the sum of $1,325,000, in the event of the use of a 30" main or $1,225,000, if a 24" main is substituted for the said 30" main, except as hereinafter provided.

"3. That the bonds to be issued as aforesaid, shall be first mortgage gold bonds in the denomination of $1,000, payable fifty years after date, and bearing interest at the rate of five per cent. per annum, payable semi-annually, and said bonds, both principal and interest, shall be payable at the office of the trustee, but the coupons may be payable at Charleston, S. C. : *Provided, however,* That any or all of the said bonds may be retired at any time upon three months' notice to that effect, printed weekly in a daily paper published in each of the cities of Philadelphia and Charleston, upon the payment · within three years from the date of said bonds, of 102 1-2 per cent. of the par value thereof, with accrued interest, and after the expiration of three years, and within five years from the date of said bonds, of 105 1-2 per cent. of the par value thereof, with accrued interest, and after the expiration of five years, of 110 per cent. of the par value thereof, with accrued interest; or the deposit of the said amount with the mortgage trustee hereinafter nominated, or its successors; and upon such deposit the said bonds thus proposed to be purchased shall forthwith cease to bear interest, and each of the bonds issued as aforesaid shall bear the foregoing provision upon its face. Each and every bond so issued shall bear a certificate, signed by the board of water commissioners aforesaid, that said bond is one of the bonds herein provided for, and shall be issued only in payment of a portion of the cost of the said works, and the expense above

defined, and said certificate shall also contain a summary of the provisions of this contract. The bonds so executed by the party of the first part, and so certified by the board of water commissioners, shall be placed in the hands of the mortgage trustee, hereinafter provided for, and by said trustee shall be issued upon the order of the party of the first part, accompanied by the authorization of the said board of water commissioners, to the party of the first part monthly, as the work progresses: *Provided, however,* That at no time shall said bonds, at ninety-five per cent. of their face value, be issued in excess of the cost of the work completed, and the material and machinery furnished and property acquired at such times, less the sum of $100,000, and the monthly certificates of the said board of water commissioners shall be the evidence of such costs, and the authority to the trustee to make deliveries of such bonds to the party of the first part, or its assigns.

"4. That as security for the payment of said bonds issued by the party of the first part, and certified by the said board of water commissioners, as hereinbefore and hereinafter provided, and for no other bonds or obligations of any kind, the said party of the first part will execute to the Girard Trust Company, of Philadelphia, Penn., a mortgage deed covering all of its franchises and property, both present and to be acquired.

"Third. That for and in consideration of the rights, powers and privileges hereinafter granted to the said party of the first part, its successors and assigns, by the party of the second part, the said party of the first part has given and granted, and by these presents does give and grant unto the party of the second part, and its successors, the right, power and privilege of purchasing all and singular the plant and property of the party of the first part, including all real and personal property, choses in action, and all cash on hand at any time before or after the completion of the said plant and within the period of fifty years from the date hereof, for a sum equal to the proposed capital stock of the said Charles-

ton Light and Water Company, viz: $100,000, and interest thereon, from the dates when the capital stock shall be paid into the treasury of the said company, at the rate of ten per cent. per annum, less any dividends which may be paid by the said company to its stockholders prior to such purchase; and upon the payment of said sum, to execute and deliver to the party of the second part such deed or deeds as shall be necessary to convey and vest in said party the absolute ownership of all and singular the said property, real and personal, choses in action, and all cash on hand, subject only to the lien of the mortgage to be executed by the party of the first part, as herein provided: *And provided, further,* That if the party of the second part shall elect at any time to purchase the said plant, and shall submit the question of such purchase to the electors of the city of Charleston, then, and in that case, there shall likewise be at the same time an election of three citizens, to be known as commissioners of public works, who shall hold office under all the terms and provisions of an act, entitled 'An act to authorize all cities and towns to build, equip and operate a system of water works and electric lights, and to issue bonds to meet the cost of same,' approved March, 1896, and all acts amendatory thereof; and so soon as the board of public works shall be elected and organized, all the powers and duties herein and hereafter devolved upon the said board of water commissioners, shall at once devolve upon the said board of public works, and said board of water commissioners shall cease to exist.

"Fourth. And the party of the first part, for itself, its successors and assigns, further covenants and agrees to and with the party of the second part, and its successors, as follows:

"1. That unless and until the party of the second part shall purchase the said property, under the option hereinbefore given, and receive the said plant from the party of the first part, its successors or assigns, then, and in that case, the said party of the first part, its successors and assigns, will, for

and during the full unexpired period of fifty years, from the date of the completion and operation of said plant, maintain in good order and repair, and conduct and operate the said works in such manner as to be able fully to keep and perform the covenants, agreements and guarantees of the said party, and to fully and efficiently supply the quantities of water herein agreed to be furnished to the city of Charleston, and to the party of the second part, of the character herein guaranteed.

"2. That during the period aforesaid, the party of the first part shall keep set and connected to the system of mains, to be constructed as aforesaid, not less than 550 fire hydrants, which shall be located as directed by the party of the second part, and shall keep the said hydrants fully supplied with water to the extent provided in the plans and specifications; and the party of the second part shall have the right to use the water from any or all of the said hydrants for building and repairing roadways, for the extinguishment of fires, and for the necessary fire practice, but for no other purpose; and in no case, except for the extinguishment of fires, shall a hydrant be opened without first notifying and obtaining the permission of the officers of the water company; nor shall more than two hydrants be opened at any one time, and longer than ten minutes in any one week, for the purpose of fire practice. In addition to the water supply through fire hydrants, as aforesaid, the party of the first part will furnish to the party of the second part a maximum quantity of 300,000 gallons of water per day for sanitary and other purposes—the said water to be furnished not through fire hydrants, but through separate connections, with water meters attached thereto.

"3. At no time before the expiration of the said period of fifty years, from the date of the completion and operation of the said plant, shall the party of the first part, its successors or assigns, charge consumers any rate or rates exceeding the following, which may be made payable quarterly in advance. But they may at any time insert a meter into the service pipe

35—60

of any consumer and supply him at meter rates, provided the meter rates shall not exceed the rates fixed in the following schedule; and any consumer shall have the right to set in an accurate meter, and pay the rent indicated by such meter, provided the amount used by the meter shall exceed twelve dollars per annum. The maximum rates per annum, above referred to, shall be as follows: * * *

"4. And it is understood and agreed between the parties hereto, that the party of the first part will purchase the property of the present water company, if the same can be obtained, at a cost not exceeding $350,000, and that such purchase is to be construed as a part of the cost of the plant to be constructed under this agreement.

"II. First. 1. And the party of the second part, for and in consideration of the promises, covenants, agreements and guarantees of the party of the first part, herein contained, hereby gives, grants and ordains to the party of the first part, its successors and assigns, the right and privilege to construct a system of water works within the limits of the city of Charleston, as they now exist, or may be hereafter extended, and for a period commencing at the date of the completion and operation of the said work, and ending at the expiration of fifty years from the date of such completion and operation, the right and privilege to maintain and operate said works for the purpose of supplying said city and its inhabitants with water for private and public use, for the purposes aforesaid, and during the period aforesaid, and for the consideration, and upon the conditions above referred to, it hereby gives, grants and ordains to the said party of the first part, its successors and assigns, the right to use the streets, alleys, sidewalks and public grounds, and the rivers, streams and bridges within the present or future corporate limits, for placing, replacing, repairing, maintaining and operating mains, pipes, hydrants and all other structures and devices requisite for the service of water from time to time during the period aforesaid, and in the manner contemplated by this contract: *Provided, however,* That upon the purchase

by the party of the second part of the plant and property of
the party of the first part, under the option given to said
party of the second part, as aforesaid, and upon the retire-
ment and cancellation of the bonds of the party of the first
part, at the time of such purchase, all the said rights, powers
and privileges herein granted to the party of the first part
shall be thereupon finally terminated and ended : *And pro-
vided, further,* That nothing herein contained shall be con-
strued to prevent the party of the first part from granting to,
or any person or corporation from exercising the right to
maintain and operate any existing water plant, and to supply
the city of Charleston and its inhabitants with water there-
from, until the full and final completion of the works herein-
before agreed upon, and the acceptance thereof by the board
of water commissioners.

"2. That during the performance of the covenants, agree-
ments and guarantees by the party of the first part, herein set
forth, upon the part of the said party to be kept and per-
formed, and unless and until the party of the second part
shall, under the option hereinbefore given said party, pur-
chase the said plant from the party of the first part, its suc-
cessors or assigns, and retire and cancel the bonds of the
party of the first part, the said party of the second part will
pay to the party of the first part, its successors or assigns, for
and during the period of fifty years from the date of the
completion and operation of the said plant, an annual rental
of $42,000 for the use of the hydrants, and for the water to
be supplied to the party of the second part, by the party of
the first part as hereinbefore provided, which said annual
rental shall be paid to the party of the first part, its successors
or assigns, by the party of the second part, at the office of
the trustee of the mortgage given to secure the said bonds,
in quarterly instalments, on or before the first day of Janu-
ary, April, July and October of each year.

"3. That after the purchase of the existing water works,
and pending the completion of the new plant, the said exist-
ing works shall be operated by the party of the first part, and

from the date of the said purchase and operation, and until
the completion and operation of the new plant, the party of
the second part shall pay to the party of the first part at the
rate of $20,000 per annum for hydrant rental, and for water
used for other public purposes.

"4. And it is mutually agreed between the parties hereto,
that the party of the second part shall have the right to direct
the extension of any of the mains, or the setting of addi-
tional hydrants: *Provided,* That no extension shall be
ordered unless the party of the second part shall at the same
time order to be erected and connected for its own use, one
or more additional hydrants: *And provided, further,* That
for every mile of extension ordered by the party of the
second part, said party shall order at least ten additional
hydrants; all of which additional hydrants so ordered shall
be used only for the purposes and upon the conditions here-
inbefore named. Nothing herein contained shall be con-
strued as preventing the voluntary extension of its system
by the party of the first part, under the rights herein con-
ferred upon the said party, in which case the party of the
second part shall be under no obligation to order any further
hydrants.

"5. And for the purposes of this contract, and of pro-
viding the necessary capital for extension and improvements,
it is hereby mutually agreed that the mortgage to be exe-
cuted upon the said plant by the party of the first part, shall
secure the payment of bonds in the total amount of
$1,500,000, and that $175,000 of the said bonds, together
with so many of the issue of $1,325,000, herein provided for,
as shall remain in the treasury of the party of the first part,
after purchasing the property of the present water company,
and constructing and equipping the plant hereinbefore re-
ferred to, shall be retained by the trustee of the said mort-
gage, and shall thereafter be issued only upon the certificates
of a board of water commissioners, to be appointed in like
manner as the board hereinbefore provided for (in the event
such extensions are made, and such bonds are issued), which

bonds shall be sold at not less than 95 per cent. of their face value, to pay the necessary cost of such extensions, additions and improvements in said plant, which may be required from time to time after the completion thereof; and in the event of the issue of any bonds in excess of the sum of $1,325,000, the supply of water to be used by the city for public purposes may be increased in the same proportion which such additional bonds shall bear to an issue of $1,325,000, and the party of the second part hereby agrees, in the event that they shall order any extension of the mains, to pay as an additional annual rental or compensation for the hydrants and for the water to be used therefrom, and for the privilege of taking such additional proportionate supply of water, to be used in the city's metered connections, for other public purposes, a sum which shall bear the same proportion to the annual rental and compensation of $42,000 for water supplied, as hereinbefore provided for, as the amount which the additional bonds so issued bears to the issue of $1,500,000 of said bonds, which additional rental or compensation shall be payable at the same time and place, and in the same manner, as the principal rental or compensation, hereinbefore referred to, and shall be subject to all provisions of this contract, in respect to such principal rental or compensation.

"6. The bonded indebtedness of the party of the first part shall in no wise be regarded as an indebtedness of the party of the second part, and nothing herein contained shall be construed as creating or imposing upon the party of the second part any liability or obligation for the payment of money, other than for the payment of the sums provided to be paid as rental or compensation to the party of the first part, for the public supply of water hereinbefore referred to.

"7. It is mutually understood and agreed, that in the construction of the said plant the party of the first part may let the same, or any part thereof, to contractors or subcontractors, and the amount paid to such contractors or subcon-

tractors shall, to that extent, be taken as the cost of said work, or such portion thereof as may be so sublet.

"8. And the party of the second part hereby resolves and ordains that the mayor shall appoint a committee, to consist of three members, to be confirmed by council, and to be known as the board of water commissioners, who shall act as the representatives of the city council, and whose duty it shall be to supervise the construction of the said plant, and examine into and keep accounts of the cost of construction of the same, issue permits for the issue of bonds for payments approved by them for the cost of construction accrued from time to time, and certify and keep a record of the bonds issued by the party of the first part, in accordance with the terms and conditions of this contract, and to perform the duties and exercise the powers hereinbefore provided to be performed and exercised by the board of water commissioners. And they shall also have such further powers and be subject to such further duties as may be hereafter lawfully vested in or imposed upon them by the city council of Charleston, and not inconsistent with the terms of this contract. The said commissioners shall elect the chairman and secretary, and may make such rules for their government as they may deem proper: *Provided, however,* That such rules shall at all times be subject to revision and amendment by the city council of Charleston. The said board shall hold office until the completion and acceptance of the said plant; and if the bonds of the party of the first part, remaining in the treasury, or any part thereof, be thereafter issued for any of the purposes hereinbefore named, then, and in that case, a new board of water commissioners shall be appointed and confirmed as hereinbefore provided, and the duties of such commissioners shall be the same with reference to such extension and improvements as those defined by the present board, with reference to the plant to be constructed as aforesaid.

"In witness whereof, the said Charleston Light and Water Company has caused these presents to be signed by its presi-

dent, countersigned by its secretary, and its corporate seal
to be affixed by such secretary; and the said city council of
Charleston has caused these presents to be signed by the
mayor of Charleston, countersigned by the clerk of council,
and its corporate seal to be affixed by said clerk, on the day
and in the year above written. * * *"

The questions presented in common in the actions herein-
before set out are:

First. That the contract under investigation is illegal, null
and void, because in violation of sec. 5, of art. X., of our
State Constitution, in that the city of Charleston is plainly
forbidden in said section to increase its bonded indebted-
ness, "if at the time of any proposed increase thereof the
aggregate amount of its already existing bonded debt
amounts to eight per cent. of the value of all taxable prop-
erty therein as ascertained by valuation for State taxation."
The value of all taxable property in the city of Charleston,
as ascertained by the valuation for State taxation, is about
$18,000,000, while the amount of its already existing
bonded debt is $3,827,700, which is far in excess of the eight
per cent. allowed by the Constitution.

Second. That the proposed contract is also violative of
the 7th section of art. VIII., of our State Constitution,
which provides, that "no city or town in this State shall
hereafter incur any bonded debt which, including existing
bonded indebtedness, shall exceed eight per centum of the
assessed value of the taxable property therein, and no such
debt shall be created without submitting the question as to
the creation thereof to the qualified electors of such city or
town as provided in this Constitution for such special elec-
tions; and unless a majority of such electors voting on the
question shall be in favor of creating such further bonded
debt, none shall be created: *Provided,* That this section shall
not be construed to prevent the issuing of certificates of
indebtedness in anticipation of the collection of taxes for
amounts actually contained or to be contained in the taxes
for the year when such certificates are issued and payable out

of such taxes: *And provided, further,* That such cities and
towns shall on the issuing of said bonds create a sinking
fund for the redemption thereof at maturity. * * *"

Third. That the act of 1899 is unconstitutional, by which
act any city in this State having over 45,000 inhabitants is
authorized to enter into contract for debts and to incur lia-
bilities by "note, bond, draft or obligation, executed, in-
dorsed or guaranteed by the city or town council of such
city or town, and approved or confirmed by a two-thirds vote
of the whole of said city or town council at a regular meet-
ing thereof, for the purpose of the establishment of a
sewerage system, or for the purpose of securing a
system, or for the purpose of securing a supply of water
or light for its public use, by contract, or for the purpose of
a lease, purchase or construction or operation by the said
city or town council of any plant or plants for water or light-
ing purposes, one or both; and for any of such purposes the
city or town council of cities or towns of over 45,000 inhabi-
tants are hereby expressly authorized and empowered to
create debts and incur liabilities beyond the municipal in-
come of the current year, upon the same being approved and
confirmed by a two-thirds vote of the whole of the said city
or town council at a regular meeting thereof: *Provided,*
That no purchase or construction of said plant or plants for
water or lighting purposes shall be made by the said city or
town council except upon a majority vote of the electors in
such cities or towns who are qualified to vote on the bonded
indebtedness of the said cities or towns. Sec. 2. That all
acts or parts of acts inconsistent with this act be, and the
same are hereby, repealed." That the said act of 1899 is
unconstitutional and, therefore, null and void, because it
authorizes the city of Charleston, being a city of over 45,000
inhabitants, to increase its bonded indebtedness when not
only the bonded debt of the city is already more than eight
per cent. of its whole property as listed for taxation, but
especially because the indebtedness she now seeks to create
in the sum of $42,000 each year for fifty years next ensuing,

is itself a bonded indebtedness, being issued under the seal of said city council of Charleston; and furthermore, said bonded indebtedness being for the purchase of water for the public of the city of Charleston, is forbidden by sec. 5, of art. VIII., of the Constitution of this State, in that the question of such bonded indebtedness has not been submitted to the electors of said city. And again because such increase of the indebtedness of said city of Charleston is really a bonded debt of said city, which is forbidden by the act of 1881, by which it is especially provided that there shall never be an increase of the bonded debt of said city as it existed in the year 1881, unless: "First. A resolution declaring the intention of the said city council to create such indebtedness or incur such liability, and specifying the amount thereof, shall first be passed at a regular meeting of the said city council by a vote of two-thirds of the whole body. Second. That the proposition, after being adopted in such manner by the said city council, shall be submitted to the qualified voters of the city of Charleston, at an election to be held under resolution of the said city council, after ninety days notice thereof; and should two-thirds of the number of qualified voters voting at the preceding municipal election vote affirmatively at said election, the proposition shall then be submitted to the General Assembly of the State of South Carolina for approval." (See pages 582 and 583 of the 17th vol. of Statutes at Large.)

The action of John Fred. Peiper also urges, in addition to the foregoing grounds, that the water supply provided for in said contract between the Charleston Light and Water Company and the city council of Charleston, "is to be taken from Goose Creek, which is a stream subject to the ebb and flow of the tide, and at times the waters of said stream are salt to its source, and at all times is salt at the proposed place of intake; that this defect cannot be remedied by filtration or by any practical process, nor can the salt water be excluded from the supply by the erection of a dam across Goose Creek below the place of intake, as proposed in the specifications of the

American Pipe Manufacturing Company attached to said contract, for the reason that Goose Creek is a tidal, navigable stream, the bed of which is the property of the State of South Carolina, upon which no structure can be placed without the consent of the State, which consent has not been given, nor can the navigation of said stream be obstructed or interrupted without the consent of the United States Government, which consent has not been obtained. That Goose Creek is the natural channel for the drainage of a large swamp area, covered with stagnant water, which is polluted with decaying vegetation, and the water of said stream at the place of intake is entirely unfit for the purposes of a water supply; and upon information and belief, the petitioner alleges that neither the proposed method of filtration nor any other feasible or practical method of purification can make the said water potable or otherwise than detrimental and injurious to the health of the inhabitants of the city of Charleston, and that said contract has been accepted by the city council without sufficient analysis of the water having been made on their behalf, or without other adequate assurances that a supply of pure and suitable water can be secured from the proposed source." Also that three or more members of the city council of the city of Charleston are directly or indirectly interested pecuniarily in the said Charleston Light and Water Company. And also that the price fixed for water for the city is exorbitantly high, and that expenses for construction, &c., are too large.

The city council of Charleston and the Charleston Light and Water Company in their return in the case first named admit the facts, but deny the legal conclusions, and in their return to the second action they both demur to the additional grounds set out in the case brought by John Fred. Pieper. It now remains for this Court to pass upon the questions here raised.

It seems to us that the paramount issue here involved is whether the $42,000 to be paid each year for fifty successive years from this date by the city of Charleston to the Charles-

ton Light and Water Company under the contract between them is a bonded indebtedness. Is it a bonded indebtedness? It certainly is, and confessedly so by all the parties to these actions, an agreement to pay $2,100,000 within fifty years in annual instalments of $42,000 made by the city of Charleston *under its corporate seal.* A bond is nothing more than an agreement or contract under seal to pay money, "or to do some other thing." See 1 Rapalje & Lawrence's Law Dictionary, 141, Harper's Reports (*Cantey, Sheriff,* v. *Duren & Beckham,* 434). See, also, 4 A. & E. Ency. of Law, at page 620, where it is said: "In the technical sense, a bond is an obligation in writing and under seal, binding the obligor to pay a sum of money to the obligee. * * * Under this definition is included every sealed obligation for the payment of money, whether absolutely or upon condition." See, also, *Boyd* v. *Boyd,* 2 N. & McC., 126, where it is said: "A bond is defined to be a deed or obligatory instrument in writing, whereby one doth bind himself to another to pay a sum of money or to do some other act." Any indebtedness, the payment of which is secured by a contract under seal, is a bonded indebtedness. This being, then, a bonded indebtedness, which confessedly is beyond the limit set out in sec. 7, of art. VIII., and also in sec. 5, of art. X., of our State Constitution, to wit: eight per cent. of the assessed value of the taxable property of the city of Charleston, is utterly null and void. To make our meaning perfectly clear, we will state the matter in detail. The city of Charleston has property listed for taxation which is about $18,000,000. It has already a bonded indebtedness of about $3,827,700, which is confessedly and actually in excess of eight per cent. of all the said city's taxable property. Sec. 7, of art. VIII., of our State Constitution, provides: "No city or town in this State shall hereafter incur any bonded debt which, including existing bonded indebtedness, shall exceed eight per centum of the assessed value of the taxable property therein * * *" While sec. 5, of art. X., of our Constitution, provides:

"* * * The bonded debt of any county, township, school district, municipal corporation or political division or subdivision of this State shall never exceed eight per centum of the assessed value of all taxable property therein. And no county, township, municipal corporation or other political division of this State shall hereafter be authorized to increase its bonded indebtedness, if at the time of any proposed increase thereof the aggregate amount of its already existing bonded debt amounts to eight per centum of the value of all taxable property therein, as ascertained by the valuation for State taxation." Hence, as the contract of the city of Charleston proposes to add to its bonded indebtedness the sum of $42,000 each year for fifty years next ensuing the date of the execution of said contract, while its bonded indebtedness is already more than eight per cent. of its taxable property, it is clearly undertaking to make a contract in violation of the Constitution of the State of South Carolina, and such contract is null and void.

But it is urged by the respondents that the power to create this debt and incur this liability beyond the municipal income of the current year is expressly given to the city of Charleston by the act of 1899 (see 23 vol. of Stat. at Large, pages 51 and 52). The respondents overlook the fact that even if this contract did not actually add to the bonded indebtedness of the city of Charleston, that the provision of sec. 7, of art. VIII., of our State Constitution, would present an insuperable barrier to the attempt by the General Assembly of this State to clothe the city council of Charleston with any such power to pledge or dispose of the municipal income for an indefinite term of years, for it is there provided "* * * That this section shall not be construed to prevent the issuing of *certificates of indebtedness* in anticipation of the collection of taxes for amounts actually contained, or to be contained, in the taxes for the year when such certificates are issued and payable out of such taxes." This provision was evidently inserted in this section in order to enable a city council to make some definite provision for

current indebtedness which it was intended should be paid
from taxes when collected, but in anticipation of the collec-
tion of said taxes.    Such a scheme would terminate with the
year in which the taxes would be collected.    It was not
intended, nor did it do so, to clothe the city council with
power by one contract to pledge $42,000 of each year's taxes
for the period of fifty years next ensuing.    The terms of the
section are exhaustive of the power.    The General Assem-
bly could not add to it, for the expression of the Constitution
whereby a municipal corporation is allowed to issue certifi-
cates of indebtedness in advance of the receipt of the taxes
to pay such certificates, is a negation of any power in a city
government to do more than what is expressly contained in
the grant of power heretofore recited as contained in such
section of the Constitution.    It appears that its framers had
in view the well preserved distinction existing between what
is known as *ordinary or current indebtedness,* and what, on
the other hand, is known as *extraordinary indebtedness;* for
in sec. 11, of art. X., of the Constitution, where the General
Assembly of this State was forbidden to add to the present
bonded debt of the State without first obtaining a vote of the
people of the State authorizing such increase, the Constitu-
tion expressly authorizes the General Assembly to create a
debt "for the ordinary and current business of the State;"
and in sec. 2 of this same art. X., the General Assembly was
directed to provide an annual tax, "to defray the estimated
expenses of the State for each year; and whenever it shall
happen that the *ordinary expenses* of the State for any year
shall exceed the income of the State for such year, the
General Assembly shall provide for levying a tax for the
ensuing year sufficient, with other sources of income, *to pay
the deficiency of the preceding year,* together with the esti-
mated expenses of the ensuing year."    This sec. 11, of art.
X., of the State Constitution, provides that any extraordi-
nary indebtedness of the State, that is not ordinary, shall be
contracted by loan on State bonds in these words : "And any
debt contracted by the State shall be by loan of State bonds

* * *" It is thus seen that while the provisions of the State Constitution gave latitude to the General Assembly as to indebtedness for ordinary and current business, yet it required such indebtedness wiped out by money received from taxation the year of, or the next year to, the creation of such indebtedness. So in the matter of cities and towns, they were not allowed to create a bonded indebtedness beyond eight per cent. of their taxable values; yet they, too, were allowed to create an indebtedness in anticipation of the payment of the taxes to be collected during the year such indebtedness for ordinary or current purposes was created. As before remarked, this contract between the Charleston Light and Water Company and the city of Charleston is unconstitutional and, therefore, null and void.

We might rest here, but as some reference was made in the petition of John Fred. Pieper to the presence of three members of the city council of Charleston among the stockholders of the Charleston Light and Water Company, we will say: That the high character of the three gentlemen in question would show that their presence in this contract on both sides, so to speak, was due to their great anxiety to promote the best interests of the public in the matter of a water supply and not for any profit to themselves; still, it is our duty to say that their conduct is illegal; no trustee can, under the law, contract with himself in his individual character. *Thomson* v. *Peak,* 38 S. C., 440; *Turnipseed* v. *Sirrine,* 60 S. C., 272.

We will not, because it is unnecessary, disturb the waters of Goose Creek in this opinion.

It is the judgment of this Court, that the prayer of the petitioners be granted; and, therefore, that the contract between the Charleston Light and Water Company and the city council of Charleston herein embodied, is declared to be beyond and without the power of said city council of Charleston to enter upon, agree to and make. And that the said city council of Charleston, its successors, officers, agents and employees, be perpetually enjoined and restrained from

entering into or executing the said contract; or if the same be already executed by them, from entering upon or performing any matters in the said contract undertaken and by the said city of Charleston agreed to be performed. And that the Charleston Light and Water Power Company be perpetually enjoined and restrained from issuing, or undertaking to issue, and bonds or evidences of debt purporting to be issued in pursuance of said contract.

MESSRS. CHIEF JUSTICE McIVER and JUSTICES GARY and JONES *concur in the result.*